RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0274p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

MIGUEL ANGEL MOCTEZUMA-REYES,

　　　　　　　　　　　　　　*Petitioner*,

　　*v.*

MERRICK B. GARLAND, Attorney General,

　　　　　　　　　　　　　　*Respondent*.

┐
│
│
│
├　No. 23-3561
│
│
│
┘

On Petition for Review from the Board of Immigration Appeals.
No. A 216 029 200.

Decided and Filed:  December 23, 2024

Before:  STRANCH, THAPAR, and MURPHY, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:**  Terence G. Hoerman, AMERICAN IMMIGRATION HELP NOW, P.C., Grosse Pointe Park, Michigan, for Petitioner.  Aric A. Anderson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

　　　　THAPAR, J., delivered the opinion of the court in which MURPHY, J., concurs, and STRANCH, J., concurs in the judgment.  STRANCH, J. (pp. 10–11), delivered a separate concurring opinion.

_____

### OPINION

_____

　　　　THAPAR, Circuit Judge.  An Immigration Judge denied Miguel Angel Moctezuma-Reyes's application for cancellation of his removal from the United States.  The Board of Immigration Appeals affirmed.  The Immigration Judge and the BIA's interpretation of the

operative statute was correct, and their application of the statute to these facts doesn't warrant reversal. We deny the petition for review.

I.

Moctezuma-Reyes is a Mexican citizen who illegally entered the United States in 2005. Since then, he's lived in Michigan with his wife, three of his four children (his daughter and his two younger sons), and his niece. His daughter, Ana, is 31 years old and a DACA recipient. His younger sons are 14 and 7 years old. They're American citizens. His wife, Maria Lourdes Sanchez Chama, is a Mexican citizen without work authorization or legal status in the United States.

Moctezuma-Reyes works in a fence factory, and his daughter Ana is a medical assistant. Together, they financially support the family with a combined annual salary of roughly $50,000. Moctezuma-Reyes also gives financial support to his oldest son, who is a student in Mexico.

The Department of Homeland Security initiated removal proceedings against Moctezuma-Reyes in 2018. Congress has empowered the Attorney General to cancel an alien's removal, but only if the alien satisfies four factors: (1) the alien has been physically present in the United States for at least ten years; (2) the alien has "been a person of good moral character" during his time here; (3) the alien hasn't been convicted of certain crimes; and (4) the alien "establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." 8 U.S.C. § 1229b(b)(1).

Moctezuma-Reyes applied for cancellation of removal. An Immigration Judge denied his petition for cancellation, and the BIA adopted the Immigration Judge's decision. The Immigration Judge and the BIA both concluded that Moctezuma-Reyes doesn't satisfy the fourth factor—"exceptional and extremely unusual hardship" to qualifying relatives. Moctezuma-Reyes has petitioned us for review of that determination. *See id.* § 1252(a)(2)(D).

II.

Moctezuma-Reyes contends that his removal would "result in exceptional and extremely unusual hardship" for his two youngest children, who are United States citizens. *See id.* § 1229b(b)(1). He fears that his young sons will endure financial and emotional hardship in the wake of his removal.

To assess the BIA's conclusion that Moctezuma-Reyes hasn't met the statute's "exceptional and extremely unusual hardship" standard, we must answer two questions: What does the statute mean? And how does Moctezuma-Reyes's particular situation map onto that meaning?

A.

The meaning of "exceptional and extremely unusual hardship" is a "purely legal" question. *Singh v. Rosen*, 984 F.3d 1142, 1149 (6th Cir. 2021) (emphasis omitted). So normally we must resolve its meaning on our own. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024).

But even with *Loper Bright* now on the books, one might claim that we should nevertheless defer to the BIA on the legal meaning of "exceptional and extremely unusual hardship." Why? Because the Supreme Court has instructed us that occasionally the best reading of a particular statute will reveal that Congress expressly and explicitly delegated discretion to the agency—and that we must defer to the agency's exercise of its discretion. *Id.* at 2263. For example, Congress may say that the agency can regulate in accordance with broad, flexible standards like "appropriate" and "reasonable" only when the agency "finds" those standards have been met or if in its "judgment" those standards have been satisfied. *See id.* at 2263 n.6. This sort of express language conferring discretion on the agency is critical: If broad language alone triggered deference, we'd unwittingly return to construing less than precise words as implicit delegations to the agency that warrant deference. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–44 (1984). That can't be right. The case that declared "*Chevron* is overruled" didn't quietly reinstitute it. *Loper Bright*, 144 S. Ct. at 2273.

If we're confronted with one of these statutes that has such express language conferring discretion on the agency to interpret a broad standard, *Loper Bright* explains that our job is threefold. First, we independently determine the scope of Congress's delegation of authority to the agency. *Id.* at 2263. Second, we ensure the delegation doesn't violate the Constitution. *Id.* And third, we determine whether the agency's interpretation stays within the scope of the delegation. *Id.*

Section 1229b(b)(1)(D)'s "exceptional and extremely unusual hardship" standard does not qualify for this sort of deference.

To be sure, broad language like "exceptional and extremely unusual hardship" looks a bit like terms such as "appropriate" and "reasonable." *Id.* But the actual statutes that *Loper Bright* cited as examples of delegations that may call for deference don't only have broad language. They pair that language with words that expressly empower the agency to exercise judgment. For example, the Court cited a provision of the Clean Water Act empowering the EPA to establish pollution limits that "in [its] judgment" protect "public health." *Id.* at 2263 n.6 (quoting 33 U.S.C. § 1312(a)). It also cited a provision of the Clean Air Act directing the EPA to regulate power plants "if the Administrator finds such regulation is appropriate and necessary." *Id.* (quoting 42 U.S.C. § 7412(n)(1)(A)).

Section 1229b(b)(1)(D) contains no such language vesting the BIA with discretion to determine the meaning of "exceptional and extremely unusual hardship." Exercising power delegated to it by the Attorney General, the BIA has discretion over the ultimate decision to cancel removal. 8 U.S.C. § 1229b(b)(1); *see Hernandez v. Garland*, 59 F.4th 762, 766 (6th Cir. 2023). The BIA "may" cancel removal if the alien is eligible for cancellation. 8 U.S.C. § 1229b(b)(1). But there's no such discretionary language when it comes to determining whether the alien is eligible in the first place; eligibility isn't up to the "judgment" or "opinion" of the BIA. *See Singh*, 984 F.3d at 1151; *Wilkinson v. Garland*, 601 U.S. 209, 222, 225 n.4 (2024). Because "exceptional and extremely unusual hardship" goes to eligibility, it follows that the BIA has no discretion to define this standard.

Meanwhile, other provisions of the same statute expressly empower executive agencies to exercise discretion when determining whether an alien will face extreme hardship. For example, one provision states that if the Secretary of Homeland Security is of "the opinion" that certain aliens "would suffer extreme hardship" from removal, the Secretary can admit the aliens as lawful permanent residents. 8 U.S.C. §§ 1255(l)(1), (l)(1)(c)(ii); *see also Wilkinson*, 601 U.S. at 224 (collecting examples); *Singh*, 984 F.3d at 1151–52 (same). Those instances matter because we "presume that Congress acts intentionally when it uses different language across similar provisions." *Singh*, 984 F.3d at 1152.

What's more, the precursor to the current cancellation-of-removal provision included precisely the sort of delegation of discretion that this statute lacks. The old version allowed suspension of deportation if, "in the opinion of the Attorney General," the person's deportation would "result in exceptional and extremely unusual hardship" to the alien or qualifying relatives. *Wilkinson*, 601 U.S. at 224 (quoting 66 Stat. 163, 214–16). We can't overlook "this important textual change." *Singh*, 984 F.3d at 1153. And the Supreme Court pointed to this exact language in rejecting the government's recent attempt to "read that discretion back into the current version of the statute." *Wilkinson*, 601 U.S. at 224.

So, to sum up, there are rare circumstances where a court may have to defer to an agency. But we must be sure. The actual delegation of authority to the agency must be clear: imprecise wording alone won't cut it. *Chevron* is no more. Before we defer to the agency, we must find that the statute expressly confers discretion on the agency. For example, Congress must empower an agency to regulate in accordance with its "judgment" or "opinion," or when the agency "finds" some condition to hold true. *See, e.g.*, 33 U.S.C. § 1312(a); 8 U.S.C. § 1255(l)(1); 42 U.S.C. § 7412(n)(1)(A). This provision contains no such phrase.

Thus, we need to independently assess the meaning of the statute's "exceptional and extremely unusual hardship" standard. We start by reading the language. The word "exceptional" means "rare" or "deviating from the norm." *Exceptional*, Merriam-Webster's, https://www.merriam-webster.com/dictionary/exceptional; EXCEPTIONAL, Black's Law Dictionary (12th ed. 2024) ("Unlikely to occur often; out of the ordinary course; uncommon or unusual"). Similarly, the word "unusual" means "uncommon" or "rare." *Unusual*, Merriam-

Webster's, https://www.merriam-webster.com/dictionary/unusual; UNUSUAL, Black's Law Dictionary (12th ed. 2024) ("Extraordinary; abnormal"). So the words "exceptional" and "unusual" have very similar meanings; both essentially mean that the hardship must be rare. Congress's choice to use both terms—likely a "belt-and-suspenders approach" to drafting—leaves no doubt that the hardship must fall well outside the norm. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176–77 (2012). That conclusion is further confirmed by Congress's decision to use the adverb "extremely" to modify "unusual." *See Extreme*, Merriam-Webster's, https://www.merriam-webster.com/dictionary/extreme (defining "extreme" as, among other things, "existing in a very high degree," "going to great or exaggerated lengths," and "exceeding the ordinary, usual, or expected").

How can a hardship be extremely rare? Either in terms of the degree of hardship or the type of hardship. So, we conclude that "exceptional and extremely unusual hardship" means hardship sustained by a deported alien's qualifying relatives that's significantly different from or greater than the hardship that a deported alien's family normally experiences.

When assessing the type and degree of hardship, the baseline we must use is the hardship associated with all deportations. Ordinary deportations create hardship. But as compared to other deportations, many severe hardships resulting from deportation aren't rare, but expected—like the loss of financial prospects, separation from loved ones, and reduced educational opportunities. In other words, this is a difficult burden for a petitioner to meet.

In many ways, the BIA's interpretation of the statute squares with ours. The BIA has interpreted the "exceptional and extremely unusual hardship" standard as requiring the alien "to establish that his qualifying relatives would suffer hardship that is substantially different from, or beyond, that which would normally be expected from the deportation of an alien with close family members here." *In re Monreal-Aguinaga*, 23 I. & N. Dec. 56, 65 (BIA 2001). That aligns with our independent assessment of the statute's meaning.

The concurrence argues that *Loper Bright* gives us no authority to derive the "exceptional and extremely unusual hardship" standard "from new cloth." Concurring Op. at 10. But *Loper*

*Bright* instructed us to carry out our judicial duty to say what the law is, even when agencies are involved. That's what we've done here.

And contrary to the concurrence's claims, we haven't skirted *Loper Bright*'s instruction that "[t]he holdings of . . . cases that specific agency actions are lawful . . . are still subject to statutory *stare decisis* despite [the] change in interpretive methodology." 144 S. Ct. at 2273. Our *Chevron*-era precedents here remain standing. What's more, there's little daylight between our interpretation of the statute and that of the BIA in *Monreal*.

The concurrence also errs when it says that we're wrong to interpret the statute without briefing focused on the extent of the BIA's discretion to interpret this statutory standard. The government and Moctezuma-Reyes are arguing about the meaning of the statute and the agency's interpretation of it. And the government has asked us to defer to the agency's interpretation. But it's "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). And we must bear that responsibility when we resolve real-world disputes about the law's meaning (like in this case), even when an agency is involved. *Loper Bright*, 144 S. Ct. at 2273.

Nor does our failure to cite *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), or *Monreal* when coming to our conclusion somehow disregard an instruction from *Loper Bright*. In *Loper Bright*, the Supreme Court observed that an agency's longstanding interpretation of a statute "may be especially informative" to us as we interpret that same statute. *Id.* at 2267. That observation is not a mandate to look to or defer to the agency's interpretation. The fact that we reached our conclusion through our own "independent statutory interpretation" is not "impermissibl[e]." Concurring Op. at 11. Again, it's our job.

Moctezuma-Reyes, for his part, contends that *Monreal* is incorrect and that a more liberal, subjective standard should govern. Specifically, he critiques how *Monreal* asks whether the hardship is abnormal but then assesses abnormality by way of considerations that are "decidedly normal in nature," like family ties, how long the alien has been in the United States, the health of the alien and his qualifying family members, the conditions of his home country, and the like. Pet. Br. at 10; *see also Monreal*, 23 I. & N. Dec. at 63. Moctezuma-Reyes's

critique of *Monreal* comes up short. When figuring out how unusual a hardship is, it makes complete sense to note the sorts of considerations that contribute to hardship in every removal and to then assess how a particular alien's situation maps onto those considerations. Every alien has answers to questions about their length of stay, the extent of their family ties here, their own health and that of their family members, and the like. But depending on their precise answers to these questions, the hardship that their qualifying relatives will experience due to the alien's removal will be more or less rare. Differences in degree can be differences in kind. *Monreal* squares with the best reading of the statute.

B.

Now that we know the statute's meaning, we ask: Has Moctezuma-Reyes established that his qualifying relatives—specifically, his young sons—will suffer hardship that's substantially different from or greater than that which normally results from a loved one's deportation? That's a mixed question of law and fact. *Wilkinson*, 601 U.S. at 222. So we have jurisdiction to review the BIA's answer, although our review is deferential. *Id.* at 225. Just how deferential should our review be? Neither the Supreme Court nor our circuit has answered that question precisely. *See id.*; *Singh*, 984 F.3d at 1154. There's no need to resolve the question here: No matter the precise level of deference, the Immigration Judge and the BIA correctly found that Moctezuma-Reyes "failed to establish the required 'exceptional and extremely unusual hardship' to his family." *Singh*, 984 F.3d at 1154 (citation omitted).

Why? Consider the facts. After Moctezuma-Reyes's removal, his wife, daughter, and two young sons plan to remain in the United States. Moctezuma-Reyes points to the financial and emotional difficulties that his two young sons will face because of his removal as extreme and unusual hardship. But financial and emotional strains are the typical results of removal; they aren't rare. *See, e.g.*, *Tolentino-Hernandez v. Garland*, No. 20-4021, 2021 WL 4782689, at *2–3 (6th Cir. Oct. 13, 2021); *In re Andazola-Rivas*, 23 I. & N. Dec. 319, 323 (BIA 2002). And the fact that Moctezuma-Reyes's daughter Ana works helps mitigate the financial hardship. *See Francisco-Diego v. Garland*, No. 21-3870, 2022 WL 1741657, at *3 (6th Cir. May 31, 2022). Also, Moctezuma-Reyes hasn't shown that he won't be able to work in Mexico, even if getting a job there may prove difficult. His ability to work also counsels against upsetting the BIA's

determination. *See Rodriguez-Salas v. Garland*, 849 F. App'x 582, 585 (6th Cir. 2021). In addition, Moctezuma-Reyes's sons aren't without a support structure in the United States, and they don't have "compelling special needs in school." *Monreal*, 23 I. & N. Dec. at 63.

In sum, "the exceptional and extremely unusual hardship standard must be limited to 'truly exceptional' situations." *Matter of J-J-G-*, 27 I. & N. Dec. 808, 814–15 (BIA 2020) (quoting *Monreal*, 23 I. & N. Dec. at 62). Moctezuma-Reyes's situation doesn't rise to that level.

\*   \*   \*

In laying out why Moctezuma-Reyes can't stay, we've omitted much of what makes him the man he is: a devout Catholic, a loving father as well as husband, and a godfather to six children. As the Immigration Judge described Moctezuma-Reyes when explaining the decision to deny his application, he's "a good person, a good father, a good husband." A.R. 170. But just like that judge, we must uphold the law.

Therefore, the petition for review is denied.

―――――――――――――

**CONCURRENCE**

―――――――――――――

JANE B. STRANCH, Circuit Judge, concurring in the judgment. I concur in the judgment and write separately to address my concerns about employing this case as the vehicle to define the "exceptional and extremely unusual hardship" test.

First, the issue of the BIA's discretion to interpret "exceptional and extremely unusual hardship" in 8 U.S.C. § 1229b(b)(1)(D) is not one raised by either party. The issue was not briefed or argued. Should it fall to this court to independently interpret "exceptional and extremely unusual hardship," a major legal question that will impact scores of removal cases, I believe we should do so only where the issue is raised and litigated by the parties. Allowing both the government and immigration advocates, the most experienced players in this arena, to present arguments on the proper criteria for cancellation of removal would, in my estimation, aid in making an appropriate decision both as to statutory interpretation and practical efficacy.

Second, *Loper Bright* does not give this court the power or the responsibility to define "exceptional and extremely unusual hardship" from new cloth—it instead teaches that reinterpreting a statute should be undertaken only with great caution. *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). *Loper Bright* held that prior cases applying *Chevron* deference to agencies' statutory interpretations remain authoritative precedent. *Id.* ("[T]o say a precedent relied on *Chevron* . . . is not enough to justify overruling a statutory precedent."). The Supreme Court itself, moreover, has enforced the BIA's "exceptional and extremely unusual hardship" test as set forth in *In re Monreal-Aguinaga*, 23 I. & N. Dec. 56, 62 (2001). *Wilkinson v. Garland*, 601 U.S. 209, 215-16 (2024). Time and time again, we have applied and enforced the *Monreal-Aguinaga* test. *See, e.g.*, *Aburto-Rocha v. Mukasey*, 535 F.3d 500, 503-04 (6th Cir. 2008); *Ahmad v. Holder*, 523 F. App'x 366, 368-69 (6th Cir. 2013). These cases are authoritative precedent on the statutory meaning of "exceptional and extremely unusual hardship," and the Court in *Loper Bright* expressly disclaimed any intention to upend such precedent. *See* 144 S. Ct. at 2273.

Third, even were we to disregard our past precedent under § 1229b(b)(1)(D) and determine the meaning of "exceptional and extremely unusual hardship" anew, *Loper Bright* instructs us to treat the statutory interpretations of agencies as "especially informative" and persuasive. *See* 144 S. Ct. at 2267 (2024) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). The majority here concludes that its test aligns with the *Monreal-Aguinaga* test. But in reaching that conclusion, it impermissibly conducts its own independent statutory interpretation without any discussion of longstanding agency precedent.

Because Moctezuma-Reyes has not shown that he meets the criteria for cancellation of removal under the old test, and because no party has challenged the BIA's authority to interpret § 1229b(b)(1)(D), I would affirm the BIA's judgment and expressly reserve ruling on the current test. In my experience, further litigation regarding cancellation of removal and its tests will soon follow and will aid in knowledgeably addressing the issue. Because I would wait for a vehicle in which the stakeholders directly raise and litigate the "exceptional and extremely unusual hardship" test, I concur in the judgment.