# United States Court of Appeals
## For the First Circuit

No. 22-1538

JULIO BENIGNO BLANCO CONTRERAS;
GLORIA ISABEL MARMOL LOPEZ,

Petitioners,

v.

PAMELA BONDI,
Attorney General,[*]

Respondent.

PETITION FOR REVIEW OF A DECISION OF
THE BOARD OF IMMIGRATION APPEALS

Before

Gelpí, Lipez, and Thompson, Circuit Judges.

Randy Olen for petitioners.

Rebecca Hoffberg Phillips, Senior Litigation Counsel, Office
of Immigration Litigation, with whom Brian Boynton, Principal
Deputy Assistant Attorney General, Civil Division, and Daniel E.
Goldman, Senior Litigation Counsel, Office of Immigration
Litigation, were on brief, for respondent.

April 9, 2025

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2),
Attorney General Pamela Bondi is automatically substituted for
former Attorney General Merrick B. Garland as respondent.

**LIPEZ, Circuit Judge**. Petitioners Julio Benigno Blanco Contreras and Gloria Isabel Marmol Lopez, a husband and wife who are natives and citizens of Guatemala, petition for review of the Board of Immigration Appeals' ("BIA's") decision upholding the Immigration Judge's ("IJ's") denial of their applications for cancellation of removal pursuant to section 240A(b)(1) of the Immigration and Nationality Act ("INA") (codified at 8 U.S.C. § 1229b(b)(1)). Their applications were denied on the basis that petitioners did not establish that their removal and their family's relocation to Guatemala would impose "exceptional and extremely unusual hardship" on their children who are United States citizens. 8 U.S.C. § 1229b(b)(1). Because we determine that the BIA legally erred by failing to consider key record evidence in its review of the IJ's decision -- findings in a psychological report assessing the mental health status of one of petitioners' children -- we grant the petition, vacate the BIA's order, and remand for further proceedings.

## I.

### A. Background Law

When an IJ determines that a noncitizen is removable for violating immigration laws, the noncitizen may still have means of obtaining discretionary relief from removal. See id. § 1229b. As relevant here, an IJ "may cancel removal of" a noncitizen "who is inadmissible or [removable] from the United States." Id.

- 2 -

§ 1229b(b)(1).  If the IJ grants a noncitizen's application for cancellation of removal, the noncitizen will be permitted to remain in the country lawfully.  Id.

In deciding whether to cancel the removal of a noncitizen, and grant lawful-permanent-resident status, the IJ "proceeds in two steps." Wilkinson v. Garland, 601 U.S. 209, 212 (2024).  First, the IJ must determine whether the noncitizen meets the statutory requirements to be eligible for cancellation of removal.  Id.  Noncitizens who do not already possess lawful-permanent-resident status must establish that (1) they "ha[ve] been physically present in the United States for a continuous period of not less than 10 years" before applying for cancellation; (2) they "ha[ve] been . . . person[s] of good moral character during such period"; (3) they "ha[ve] not been convicted of" certain criminal offenses; and (4) their "removal would result in exceptional and extremely unusual hardship to the [noncitizens'] spouse[s], parent[s], or child[ren]" who are citizens or lawful permanent residents "of the United States." 8 U.S.C. § 1229b(b)(1)(A)-(D).

Second, after determining whether the noncitizen is eligible for cancellation of removal, the IJ must decide "whether to exercise . . . discretion favorably and grant the noncitizen relief in the particular case." Wilkinson, 601 U.S. at 212-13.

- 3 -

An IJ's decision on an application for cancellation of removal may be appealed to the BIA.  8 C.F.R. § 1003.1(b)(3).  On appeal, the BIA reviews the IJ's conclusions of law and discretionary determinations de novo and its findings of fact for clear error.  Id. § 1003.1(d)(3)(i)-(ii); see also In re S-H-, 23 I. & N. Dec. 462, 464 (BIA 2002) ("[T]he [BIA] must defer to the factual determinations of an [IJ] in the absence of clear error.").

## B. Facts and Procedural History

Contreras entered the United States without inspection in 2001, when he was around twenty-five years old, hoping to escape the poverty and violence of his native country.  In 2002, he was joined by Lopez, then age thirty-five, who was admitted to the United States as a nonimmigrant visitor authorized to remain for six months.  Neither Contreras nor Lopez has left the country since entering.  The couple, who have been together for over twenty-five years, have two children who are United States citizens -- a son, A.B.M., and a daughter, M.B.M.

After applying for asylum and withholding of removal in 2013 but failing to appear for their scheduled asylum interviews, petitioners were issued Notices to Appear that charged them with being subject to removal under the INA.[1]  Petitioners conceded

---

[1] Contreras was charged with being subject to removal pursuant to section 212(a)(6)(A)(i) of the INA as a noncitizen present in the United States without being admitted or paroled.  Lopez was charged with being subject to removal pursuant to section

- 4 -

removability and indicated that they would be seeking voluntary departure, withholding of removal, and cancellation of removal.

A hearing on petitioners' applications was completed in May 2019. During an earlier portion of the hearing, petitioners clarified that they were no longer pursuing voluntary departure or withholding of removal, leaving only their requests for cancellation of removal pursuant to 8 U.S.C. § 1229b(b)(1). The parties agreed that petitioners satisfied the first three statutory criteria to be eligible for cancellation of removal such that only the "exceptional and extremely unusual hardship" requirement and the IJ's ultimate discretionary determination were in play.

To satisfy the fourth statutory criterion, petitioners submitted written evidence, including personal affidavits and medical documentation, and presented extensive testimony, all of which was aimed at showing the hardship that petitioners' removal to Guatemala would cause their minor children. As background, Lopez, whom the IJ found to be a credible witness, testified about her own difficult circumstances. She stated that she grew up in Guatemala with seven siblings, that her family was very poor, and that she was forced to leave school at age twelve because her

---

237(a)(1)(B) of the INA as a noncitizen who, after being admitted as a nonimmigrant, remained in the United States longer than permitted.

family could no longer afford it.  She also explained that she had diabetes, gastritis, high blood pressure, and high cholesterol and that she took twelve pills per day and visited her doctor every three months to manage those ailments.  Lopez expressed her worry that she would be unable to afford to see a doctor or continue her medical treatment in Guatemala.

Lopez repeatedly voiced concern for how her son A.B.M. and daughter M.B.M., who, at the time, were fifteen and nine, respectively, would fare in Guatemala.[2]  She explained that A.B.M. and M.B.M. had not been to Guatemala and were unfamiliar with its customs and traditions, although both could speak, read, and write in Spanish fluently.  Lopez also testified that the family would not have a place to live in Guatemala, and Lopez believed that she and Contreras would be unable to afford to continue sending their children to school, whereas both children were doing well in their schools in the United States.  Further, Lopez voiced fear for her children's safety in Guatemala because of the prevalence of violent

_____

[2] When asked whether A.B.M. and M.B.M. would remain in the United States if their parents were removed to Guatemala, Lopez replied that she "cannot respond to that question" because she and Contreras "have not saved any money to go and live there." However, both Lopez and Contreras specified in their cancellation applications that if they were removed, their children would come with them.

crime and her family's personal experiences with gang violence in that country.[3]

Of primary relevance here, Lopez emphasized that she believed petitioners' removal would harm A.B.M. in particular because of his physical and mental health struggles. She testified that A.B.M. suffered from obesity, high cholesterol, and seasonal allergies, requiring him to maintain a diet high in fruits, vegetables, and water and to see a doctor every three months. A patient note from a physical examination of A.B.M. in April 2016 (hereinafter "the 2016 physical examination report"), which petitioners submitted as documentary evidence, corroborated Lopez's testimony regarding A.B.M.'s physical health. In addition to the ailments that Lopez described, the 2016 physical examination report reflected that A.B.M. suffered from acanthosis nigricans (a skin disorder), bilateral astigmatism, snoring with apnea and mild tonsillar hypertrophy, and a vitamin D deficiency, and that he had undergone an appendectomy.

Lopez further testified that about ten years earlier, when A.B.M. was six years old, he was touched sexually by peers in his kindergarten class. Lopez explained that, after the assault, petitioners did not take A.B.M. out of school based on counsel

---

[3] Lopez testified that several members of her family in Guatemala had been threatened and extorted by gangs, and one of her sisters was kidnapped by a gang and never heard from again.

from his teacher that if he left school, A.B.M. would feel guilty and responsible for the assault. A.B.M. also did not receive counseling or psychological services following the assault, Lopez elaborated, because the psychologist to whom A.B.M. was referred told Lopez that her son "hadn't suffered that much."

An evaluation of A.B.M. completed by a licensed mental health counselor in July 2018, when A.B.M. was fourteen years old, and submitted by petitioners (hereinafter "the 2018 psychological report") provided additional details regarding the sexual abuse A.B.M. experienced as a kindergartner. According to the 2018 psychological report, A.B.M. alerted his teacher to "unusual behaviors in the bathroom with two other students" and later told Lopez that the other students had "touched his penis and would not allow him to pull his pants up." Lopez reported the incident to the school, and she was told that a subsequent investigation substantiated A.B.M.'s account. However, the school did not file a report with child services or law enforcement. The 2018 psychological report noted that, after the assault, A.B.M. became fearful, anxious, and upset, refusing to go to school "because he was so scared of the other students." He also began wetting the bed every night. Lopez "sought assistance from the school" but received only "minimal response," so she and Contreras opted to send A.B.M. to a new school.

The licensed mental health counselor determined that, following the assault, A.B.M.'s parents "were not given the needed services they should have been offered through counseling, child services and possibly [the] court system"; that A.B.M. "was not afforded the resources of mental health counseling to assist with his fears and anxiety[] or legal advocacy to address the assault he suffered"; and that the assault was not treated with "the necessary importance." The counselor also concluded that A.B.M.'s "presentation and history are consistent with Major Depression" and that, at the time of the evaluation, his symptoms persisted, "clearly caus[ing] [A.B.M.] significant distress and impairment." She recommended that A.B.M. "obtain continued psychotherapeutic services to address his depressive disorder."

After the close of evidence, the IJ determined that, although petitioners would be entitled to a favorable exercise of discretion, they had not established that A.B.M. and M.B.M. would experience "exceptional and extremely unusual hardship" due to their parents' removal. In reaching that conclusion, the IJ made factual findings that M.B.M. had no medical issues; that both children were doing well in school and could speak, read, and write in Spanish; and that "both parents would be able to work in Guatemala to support the family were they to return." The IJ also found "insufficient evidence that [A.B.M.] currently suffers from any mental health conditions or disorders as a result" of being

sexually abused and, specifically referencing the 2016 physical examination report, determined that A.B.M. was otherwise "generally healthy." Based on those findings, and while reiterating that he would have granted petitioners relief had they met the hardship standard, the IJ denied petitioners' applications for cancellation of removal and ordered them removed to Guatemala. The IJ did not mention the 2018 psychological report in his decision.

Petitioners appealed to the BIA, which affirmed the IJ's denial of cancellation of removal. The BIA rejected petitioners' claim that the IJ's finding on A.B.M.'s health was erroneous, explaining that because A.B.M. "has never required mental health counseling, medication, or any specialized medical treatment," it "discern[ed] no clear error in the [IJ's] factual finding that [A.B.M.] does not suffer from any serious medical conditions." The BIA also found no error in the IJ's determination that neither Lopez's health struggles nor the conditions in Guatemala would result in the requisite hardship to A.B.M. and M.B.M. Following the BIA's decision, petitioners timely sought this court's review.

Subsequently, we held this petition in abeyance at the joint request of the parties while petitioners' request for a grant of prosecutorial discretion was pending.[4] We later granted

---

[4] The government ultimately declined to exercise prosecutorial discretion in petitioners' case.

petitioners' unopposed motion to hold this petition in abeyance in light of the Supreme Court's grant of certiorari in <u>Wilkinson</u> v. <u>Attorney General</u>, No. 21-3166, 2022 WL 4298337 (3d Cir. Sept. 19, 2022), <u>reversed in part, vacated in part sub nom.</u> <u>Wilkinson</u> v. <u>Garland</u>, 601 U.S. 209 (2024). That decision was anticipated to resolve a circuit split regarding a federal appellate court's jurisdiction to review the determination of whether a noncitizen has established "exceptional and extremely unusual hardship." With <u>Wilkinson</u> now decided, we can resolve this case.

## II.

When the BIA does not expressly adopt the IJ's decision, "we review the BIA's decision rather than the IJ's." <u>Aguilar-Escoto</u> v. <u>Garland</u>, 59 F.4th 510, 515 (1st Cir. 2023) (quoting <u>Lin</u> v. <u>Mukasey</u>, 521 F.3d 22, 26 (1st Cir. 2008)). Because the BIA affirmed the IJ's decision after determining that the IJ's findings and conclusions were not erroneous -- rather than expressly adopting the IJ's reasoning -- "we focus our review on the BIA's decision." <u>Id.</u>; <u>see</u> <u>also</u> <u>Odei</u> v. <u>Garland</u>, 71 F.4th 75, 77-78 (1st Cir. 2023).[5]

---

[5] Both petitioners and the government assume incorrectly that our review is of the IJ's and BIA's decisions together. <u>See</u> <u>Espinoza-Ochoa</u> v. <u>Garland</u>, 89 F.4th 222, 230 (1st Cir. 2023) ("When the BIA adopts the IJ's decision but adds its own gloss, we 'review the decisions of both the BIA and the IJ' together." (quoting <u>Aldana-Ramos</u> v. <u>Holder</u>, 757 F.3d 9, 14 (1st Cir. 2014))). We construe the parties' arguments with respect to the

Petitioners raise multiple challenges on appeal. First, they argue that, contrary to the BIA's determination, the record evidence shows that A.B.M. and M.B.M. would suffer "exceptional and extremely unusual hardship" if their parents were removed to Guatemala. Second, they contend that the BIA erred by "completely ignor[ing]" key record evidence. Third, they challenge some of the IJ's findings of fact as "plainly erroneous." We address each challenge in turn, beginning with our jurisdiction.

## A. Jurisdiction and Standard of Review

As the Supreme Court has noted, "Congress has sharply circumscribed judicial review of the discretionary-relief process." Patel v. Garland, 596 U.S. 328, 332 (2022). Specifically, Congress has stripped courts of "jurisdiction to review . . . any judgment regarding the granting of" discretionary relief, which includes the denial of an application for cancellation of removal under § 1229b. 8 U.S.C. § 1252(a)(2)(B)(i). However, "[t]his bar has an important qualification." Patel, 596 U.S. at 333. Courts retain jurisdiction to "review . . . constitutional claims or questions of law." 8 U.S.C. § 1252(a)(2)(D). While for many years "interpretation of this statutory scheme largely rested with the lower courts," the Supreme Court has recently "turned its attention

---

"agency" -- i.e., the BIA and IJ together -- as instead concerning only the BIA.

- 12 -

to the jurisdictional provisions of § 1252(a)(2)" "on multiple occasions." Figueroa v. Garland, 119 F.4th 160, 164 (1st Cir. 2024). Three such occasions, ending with Wilkinson, are relevant here.

First, in Guerrero-Lasprilla v. Barr, the Supreme Court held that a "mixed question of law and fact" -- i.e., "the application of law to undisputed or established facts" -- constitutes a "'questio[n] of law' within the meaning of § 1252(a)(2)(D)" and is therefore reviewable. 589 U.S. 221, 228 (2020) (alteration in original). Then, in Patel, the Supreme Court held that "[f]ederal courts lack jurisdiction to review facts found as part of discretionary-relief proceedings" under both § 1252(a)(2)(B)(i) and § 1252(a)(2)(D). 596 U.S. at 339-40, 343, 347. For example, an IJ's determination that a witness was credible or that a child "had a serious medical condition" is an unreviewable finding of fact. Wilkinson, 601 U.S. at 222. Finally, pulling this line of cases together, the Wilkinson Court clarified that "the application of the exceptional and extremely unusual hardship standard to a given set of facts" is a mixed question of law and fact that "is reviewable as a question of law under § 1252(a)(2)(D)." Id. at 217.[6]

---

[6] Wilkinson thus abrogated our previous holdings that characterized "the agency's hardship determination as an unreviewable 'factual inquiry,'" Figueroa, 119 F.4th at 165

- 13 -

Petitioners' first argument -- that the BIA erred in concluding that their removal would not impose "exceptional and extremely unusual hardship" on A.B.M. and M.B.M. based on the established facts -- falls squarely within Wilkinson's holding. See id. Thus, we easily conclude that we have jurisdiction to address this argument. Our review of the BIA's determination "is deferential." Id. at 225.[7]

We also have jurisdiction to address petitioners' second contention -- that the BIA "completely ignore[d]" key record evidence. A BIA decision that "turn[s] a blind eye to salient facts" or "completely overlook[s] critical evidence" is erroneous as a matter of law. Diaz-Valdez v. Garland, 122 F.4th 436, 446 (1st Cir. 2024) (first quoting Sihotang v. Sessions, 900 F.3d 46,

---

(quoting Tacuri-Tacuri v. Garland, 998 F.3d 466, 471 (1st Cir. 2021)), resolving the circuit split as described.

[7] As many circuits have recognized, Wilkinson "does not provide clear guidance as to how we must determine the degree of deference owed." Cortes v. Garland, 105 F.4th 124, 133 (4th Cir. 2024). Because we resolve this case without deciding whether petitioners have met the "exceptional and extremely unusual hardship" standard, we decline to determine the precise deferential standard of review that should govern. See, e.g., Figueroa, 119 F.4th at 166 n.7 (declining to specify the standard of review post-Wilkinson where the court would reach the same conclusion regardless of the standard applied); Garcia Carrera v. Garland, 117 F.4th 9, 12 (2d Cir. 2024) (same); Moctezuma-Reyes v. Garland, 124 F.4th 416, 423 (6th Cir. 2024) (same). But see Wilkinson v. Att'y Gen., No. 21-3166, 2025 WL 759608, at *6 (3d Cir. Mar. 11, 2025) (holding as a matter of first impression "that the substantial-evidence standard governs review of a hardship determination in a cancellation-of-removal proceeding").

- 14 -

51 (1st Cir. 2018); and then quoting Aguilar-Escoto, 59 F.4th at 516-17); see also Calderon-Escobar v. Att'y Gen., No. 23-2164, 2025 WL 66347, at *3 (3d Cir. Jan. 10, 2025) ("Serious mischaracterization of evidence or the failure to consider key evidence may constitute an error of law."); Medrano Medrano v. Garland, 852 F. App'x 586, 587 (2d Cir. 2021) ("A question of law may arise where the agency overlooked or mischaracterized evidence . . . ."). When a petitioner raises a colorable claim of such a legal error, we may review that claim. See 8 U.S.C. § 1252(a)(2)(D) (permitting "review of . . . questions of law"); see also Cortes v. Garland, 105 F.4th 124, 132-33 (4th Cir. 2024) (exercising jurisdiction to consider whether the agency ignored key evidence put forth to establish "exceptional and extremely unusual hardship"); Mendez v. Holder, 566 F.3d 316, 322-23 (2d Cir. 2009) (per curiam) (same). "[W]e review preserved claims of legal error (that is, claims that turn on pure questions of law) de novo." United States v. Padilla-Galarza, 990 F.3d 60, 73 (1st Cir. 2021); see also Adeyanju v. Garland, 27 F.4th 25, 38 (1st Cir. 2022).

However, to the extent that petitioners challenge the correctness of the IJ's findings of fact, we may not address their arguments. See Wilkinson, 601 U.S. at 222 ("[A] court is still without jurisdiction to review a factual question raised in an application for discretionary relief."). Thus, apart from any

- 15 -

associated legal errors, we may not consider, for example, petitioners' assertion that the IJ erred in determining that A.B.M. "does not suffer from any serious medical conditions." See id. at 225 ("[A]n IJ's factfinding on . . . the seriousness of a family member's medical condition . . . remain[s] unreviewable.").

Assured of our jurisdiction to address petitioners' first two contentions, we proceed to the merits of those claims.

## B. Discussion

To establish "exceptional and extremely unusual hardship" under 8 U.S.C. § 1229b(b)(1), petitioners must show that their "qualifying relatives would suffer hardship that is substantially different from, or beyond, that which would normally be expected from the deportation of [a noncitizen] with close family members" in the United States. In re Monreal-Aguinaga, 23 I. & N. Dec. 56, 65 (BIA 2001). However, petitioners "need not show that such hardship would be 'unconscionable.'" In re Gonzalez Recinas, 23 I. & N. Dec. 467, 468 (BIA 2002) (quoting In re Monreal-Aguinaga, 23 I. & N. Dec. at 60). Thus, while the hardship standard for cancellation of removal no doubt "constitutes a high threshold," it "is not so restrictive that only a handful of applicants . . . will qualify for relief." Id. at 470. In determining whether the hardship standard has been met, "consideration should be given to the age, health, and circumstances of the qualifying family members, including how a

- 16 -

lower standard of living or adverse country conditions in the country of return might affect those relatives." Id. at 468. An applicant whose qualifying child has "very serious health issues," for example, might "have a strong case" for cancellation of removal. In re Monreal-Aguinaga, 23 I. & N. Dec. at 63.

Taking the facts as found, and our obligation under Wilkinson to defer to the BIA's determination on the mixed question of fact and law, it would be difficult to reject the conclusion that petitioners failed to satisfy this exacting hardship standard. We need not dwell on that issue, however, because we conclude that the BIA did not address and contend with significant record evidence in reviewing the IJ's factual findings for clear error and thus its decision was flawed as a matter of law. See Rosales Justo v. Sessions, 895 F.3d 154, 167-68 (1st Cir. 2018).

"[W]hile the BIA need not 'discuss every piece of evidence offered,'" it is not free to disregard important evidence in the record. Aguilar-Escoto v. Sessions, 874 F.3d 334, 337 (1st Cir. 2017) (quoting Lin, 521 F.3d at 28). That is, "'it cannot turn a blind eye to salient facts' and 'must fairly appraise the record.'" Aguilar-Escoto, 59 F.4th at 515 (quoting Sihotang, 900 F.3d at 51). As noted above, failure of the BIA to consider significant record evidence constitutes a "legal error" and may warrant remand. Diaz-Valdez, 122 F.4th at 445-46; see also Iza-Pullataxig v. Sessions, 700 F. App'x 60, 61 (2d Cir. 2017)

(vacating and remanding where the agency "did not analyze . . . a key piece of evidence supporting [the noncitizen's] petition for cancellation of removal"). The BIA's obligation to consider the record as a whole is inescapable when a petitioner complains that the IJ's factfinding was flawed because the IJ failed to consider key record evidence. See Aguilar-Escoto, 59 F.4th at 517 ("[I]n determining whether the IJ's finding . . . was clearly erroneous, the [BIA] itself was required to consider all evidence relevant to that analysis.").

Because the fact-intensive "exceptional and extremely unusual hardship" inquiry presents such a high bar, it is vital that due consideration be given to salient record evidence in this context. See In re Gonzalez Recinas, 23 I. & N. Dec. at 470 (describing the hardship inquiry as "a high threshold"); Mendez, 566 F.3d at 323 ("[W]e are not confident that, after taking the overlooked evidence into account and describing it accurately, the agency would come to the conclusion that Petitioner has not met the standard of 'exceptional and extremely unusual hardship.'").

As described above, the 2018 psychological report provided a detailed account of the circumstances of the sexual abuse that A.B.M. suffered. That account included an explicit finding from the mental health counselor -- who met with A.B.M. in person for the assessment -- that A.B.M.'s early childhood assault had never been treated with "necessary importance." The report

also concluded that A.B.M.'s "presentation and history are consistent with Major Depression" and that "his symptoms clearly cause significant distress and impairment," and it was recommended that A.B.M. "obtain continued psychotherapeutic services to address his depressive disorder." Such evidence was unquestionably highly pertinent to whether petitioners made the requisite showing of "exceptional and extremely unusual hardship," given that "the ages, health, and circumstances" of qualifying family members are central to the hardship inquiry. In re Monreal-Aguinaga, 23 I. & N. Dec. at 63; see also id. ("[A] strong applicant might have a qualifying child with very serious health issues . . . ."); cf. In re Kao, 23 I. & N. Dec. 45, 50 (BIA 2001) ("Extreme hardship to an applicant's children is an important factor that must receive close attention . . . .").

The BIA's decision here "gives strong reason to believe the BIA turned a blind eye to key relevant evidence," Aguilar-Escoto, 59 F.4th at 515 -- namely, critical portions of the 2018 psychological report -- in reviewing for clear error the IJ's factual finding that A.B.M. "does not suffer from any serious medical conditions." While the BIA acknowledged the existence of the 2018 report in a single-sentence summary, it did not so much as mention, let alone engage with, several key findings contained in that report. For example, the BIA did not remark on the counselor's description of the symptoms A.B.M. was experiencing or

her conclusion that A.B.M. should "obtain continued psychotherapeutic services," nor did it acknowledge the counselor's critical finding that A.B.M. and his parents "were not given the needed services they should have been offered through counseling, child services and possibly [the] court system."

Those findings in the 2018 psychological report are facially inconsistent with the BIA's statement that A.B.M. "has never required mental health counseling, medication, or any specialized medical treatment," undermining its conclusion that the IJ's factual finding on A.B.M.'s mental health was not clearly erroneous.[8]  Because the BIA failed to explain how it reconciled its conclusion with the 2018 report's contrary findings, we are left to conclude that the BIA "simply ignored th[ose] portion[s]" of the 2018 report.  Cortes, 105 F.4th at 136; cf. Domingo-Mendez v. Garland, 47 F.4th 51, 58 (1st Cir. 2022) ("When the BIA's decision is neither inconsistent with [the evidence at issue] nor gives reason to believe the BIA was unaware of it, we have no reason to doubt that the agency considered the evidence." (alteration in original) (quoting Lin, 521 F.3d at 28)).

To be sure, the BIA did state that, according to the 2018 report, A.B.M. "presented symptoms consistent with major

---

[8] We agree with petitioners as a matter of logic that "[t]he fact that [A.B.M.] did not receive" mental health services "certainly does not mean he did not need" them.

depression." Mentioning one key finding while failing to acknowledge others, however, is not enough. See Aguilar-Escoto, 59 F.4th at 515-17 (finding error where the BIA engaged with only two of the three pertinent complaints submitted by the petitioner); Cortes, 105 F.4th at 136 (concluding that the agency legally erred where, "[d]espite clearly having considered portions" of the proffered documentary evidence, it "never addressed" another key portion). Moreover, despite its brief mention of A.B.M.'s major depression, the BIA did not discuss that diagnosis or analyze how A.B.M. might be impacted because of his major depression if he and his parents were required to relocate to Guatemala. It appears, then, that the BIA merely repeated the "major depression" diagnosis from the 2018 report without assessing its significance for A.B.M.'s medical condition. The BIA's failure to address the implications of that diagnosis is a glaring omission in its review of the IJ's factfinding on A.B.M.'s health, particularly given that the IJ did not even acknowledge the 2018 psychological report in making the finding of fact on A.B.M.'s health. See Aguilar-Escoto, 59 F.4th at 516 ("The BIA's lack of meaningful analysis on this issue provides further grounds for believing it did not consider the [salient evidence].").

All told, the BIA's decision plainly "lacks sufficient indication that the key portion[s]" of the 2018 report were considered in its review of the IJ's factual finding on A.B.M.'s

health.  Cortes, 105 F.4th at 135.  Accordingly, we conclude that the BIA erred as a matter of law.  See id. at 137; see also Mendez, 566 F.3d at 323 ("[W]here, as here, some facts important to the subtle determination of 'exceptional and extremely unusual hardship' have been totally overlooked and others have been seriously mischaracterized, we conclude that an error of law has occurred."); Rosales Justo, 895 F.3d at 165 (holding that the BIA erred "in its clearly erroneous analysis" when it "fail[ed] to take into account the significant documentary evidence" put forth by the petitioner).

In reaching this conclusion, we are by no means substituting our judgment for the agency's on the issue of A.B.M.'s medical condition.  Rather, "[w]e simply hold that the BIA could not" uphold the IJ's factfinding "without explicitly addressing [petitioners'] primary evidence."  Tanusantoso v. Barr, 962 F.3d 694, 700 (2d Cir. 2020).  Remand is thus appropriate so that the BIA may adequately consider the full record -- including the critical 2018 psychological report -- in conducting its clear error review.  See Aguilar-Escoto, 874 F.3d at 336 ("[R]emand is required for the BIA to consider [the petitioner's] potentially significant documentary evidence.").  On remand, the BIA retains authority to determine what, if any, weight to give the 2018 psychological report's key findings.  But the BIA "is not free to ignore" them. Cortes, 105 F.4th at 137.

**\*\*\***

For the foregoing reasons, we <u>grant</u> the petition, <u>vacate</u> the BIA's order, and <u>remand</u> to the BIA for further proceedings consistent with this opinion.

<u>So ordered</u>.