# United States Court of Appeals
## For the First Circuit

No. 19-1687

JOSE NOLBERTO TACURI-TACURI,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Thompson and Kayatta,
<u>Circuit Judges</u>.*

Casey L. Riley for petitioner.
Jennifer Mascott, United States Department of Justice, with whom Joseph H. Hunt, Assistant Attorney General, Civil Division, Stephen J. Flynn, Assistant Director, Office of Immigration Litigation, and Annette M. Wietecha, Office of Immigration Litigation, Civil Division, United States Department of Justice, were on brief, for respondent.

---

* Judge Torruella heard oral argument in this matter and participated in the semble, but he did not participate in the issuance of the panel's opinion in this case. The remaining two panelists therefore issued the opinion pursuant to 28 U.S.C. § 46(d).

May 24, 2021

**THOMPSON, <u>Circuit Judge</u>.** In this immigration appeal, we are tasked with examining whether the petitioner, Jose Nolberto Tacuri-Tacuri (Tacuri), has established that the Board of Immigration Appeals (BIA) erred in reversing an Immigration Judge's (IJ) grant of his application for cancellation of removal. For the reasons explained below, we deny Tacuri's petition in part and otherwise dismiss it for lack of jurisdiction.

### Background

Tacuri is a native of Ecuador who entered the United States without inspection in 2001 to earn more money to help support his parents and siblings. He has lived in Massachusetts since 2003 with his wife, who also moved to the U.S. from Ecuador. Tacuri and his wife have two minor children, one son (J.T.C.) and one daughter (K.T.C.), both born in the U.S. Throughout his time living in the U.S., Tacuri has worked primarily in construction and roofing. He started his own business in this field around 2008.

Regrettably, Tacuri has had frequent contact with local police throughout his residency in the U.S., including approximately eighteen charges for driving with a suspended license or driving under the influence. A social worker became involved with Tacuri's family after his son began having some

problems at school.  Tacuri started attending a class or meetings on a regular basis to address his use of alcohol.[1]

As a result of Tacuri's frequent contact with Milford, Massachusetts police for motor vehicle violations, Immigration and Customs Enforcement (ICE) initiated removal proceedings against Tacuri in August 2018 by filing a Notice to Appear in the Boston Immigration Court.  He was detained from August 2018 to April 2020. The Department of Homeland Security (DHS) charged Tacuri as removable under the Immigration and Nationality Act (INA) § 212(a)(6)(A)(i) as an alien who had illegally entered the country.  Tacuri conceded the charge of removability and indicated he would apply for relief from removal through asylum, withholding of removal, cancellation of removal, and, in the alternative, voluntary departure.  During a hearing in December 2018, Tacuri withdrew his application for asylum and withholding of removal, leaving only his applications for cancellation of removal pursuant to the INA § 240(A) (codified at 8 U.S.C. § 1229a) and voluntary departure in the alternative.  As we will discuss in depth soon, an IJ can consider granting a nonpermanent resident's application for cancellation of removal only when the IJ finds, among other requirements, the applicant's removal would result in an

---

[1] The record does not indicate exactly what kind of course or meetings Tacuri attended, only that they were related to his use of alcohol.

"exceptional and extremely unusual hardship" to a United States relative.  8 U.S.C. § 1229b(b)(1)(D).

During the hearing, the IJ heard testimony from Tacuri and his wife about their family relationship and the effect his removal would have on their two young children.  With respect to their then five-year-old daughter, Tacuri's wife testified that K.T.C. frequently cried and asked where her father was.  As to their then twelve-year-old son, J.T.C., Tacuri's wife explained that he was "suffering" without his father, had become quiet, wasn't eating much, and was afraid of what his friends would say about his father's absence.  A report submitted from a social worker described J.T.C.'s noticeable decline in personal hygiene, causing complaints about his body odor from school officials.  Although J.T.C.'s grades improved after his father was taken into custody, his school guidance counselor expressed concern because J.T.C. had stated he worked to improve his grades so he didn't cause additional worry or stress to his mother.

J.T.C. has always been asthmatic, which has been a source of concern for Tacuri and his wife.  J.T.C. takes pills and uses an inhaler every day, which costs about $75 every two weeks despite having health insurance.  Tacuri's wife stated J.T.C.'s asthma worsened after his father's detainment.  He started experiencing chest pains and he felt less safe participating in his usual karate

- 5 -

and soccer activities without his father around to help if he were to faint.

Tacuri testified that his wife and two children would remain in the United States if he were removed due to Ecuador's lack of educational opportunities and medical resources necessary to manage J.T.C.'s asthma. As Tacuri explained, he would be unable to continue providing economic support to his family from Ecuador because he would likely earn less than $10 per day, if he could find employment at all. Tacuri's wife typically made about $350 per week working at the local grocery store but had been able to earn $500 per week after her husband's detainment by working additional hours. She expressed concern, however, that she would be unable to make enough money to support her children without her husband's assistance and income; at the time of the hearing she was already borrowing money from family members.

After considering all of the testimony and documents submitted to support Tacuri's application for cancellation of removal, the IJ concluded Tacuri's removal to Ecuador would pose an "exceptional and extremely unusual hardship" to both of Tacuri's children, but especially to his son. The IJ focused on J.T.C.'s asthma, deeming this medical condition "compelling." The IJ also concluded that Tacuri's wife would face considerable financial difficulty in paying for J.T.C.'s medical care without the assistance of Tacuri's usual income, resulting in "exceptional and

- 6 -

extremely unusual hardship" to J.T.C. The IJ decided Tacuri met the other statutory requirements for cancellation of removal and granted Tacuri's application for cancellation of removal.[2] The IJ did not reach the merits of Tacuri's alternative application for voluntary departure.

Unsatisfied with the result, DHS appealed the IJ's decision to the BIA. The BIA disagreed with the IJ's conclusion that Tacuri had met the required "exceptional and extremely unusual hardship" standard and sustained DHS's appeal. In a brief decision, the BIA focused on J.T.C.'s academic record reflecting strong grades, emphasized the IJ's finding that J.T.C.'s asthma was "currently manageable and largely stable," and noted that J.T.C. was active and played sports. Despite the IJ's finding that Tacuri's family "could struggle to provide [J.T.C.] with his required medicine," the BIA stated there was no indication J.T.C. would be deprived of his medication, especially because the family indicated Tacuri's wife and children would remain in the United States and the family could retain health insurance. Further, the

---

[2] The IJ concluded Tacuri had the requisite "good moral character" to be eligible for cancellation of removal. Although the IJ acknowledged Tacuri's "sometimes troubling relationship with alcohol," the IJ looked positively upon the fact that Tacuri met with his son's school social workers and proactively attended an alcohol course, which he attended until his detention, to change his behavior and "become a better father." Further, the IJ found that Tacuri's numerous driving offenses in multiple jurisdictions were explained by Tacuri's need to get to work despite not having a license, which he eventually remedied by hiring a driver.

BIA opined that there was no evidence J.T.C.'s asthma could not continue to be managed if Tacuri is removed to Ecuador. Aside from J.T.C.'s asthma, the BIA also found Tacuri had not demonstrated that his children's mental health issues were "exceptional and extremely unusual" for children separated from a parent. Ultimately, the BIA concluded Tacuri had not "show[n] that his return to Ecuador would have a material economic impact on his children for cancellation of removal purposes" because his wife was employed full time and Tacuri's construction skills were transferrable to Ecuador. "[A] lowered standard of living and reduced economic opportunities," the BIA reasoned, "generally are insufficient" to support "a finding of exceptional and extremely unusual hardship."

In addition, the BIA remanded Tacuri's alternative application for voluntary departure to the IJ because the IJ had not provided a ruling on this alternative relief when he granted Tacuri's application for cancellation of removal.[3] Before the IJ issued a ruling about voluntary departure, Tacuri filed a petition for review of the BIA's decision in this Court. The IJ subsequently granted Tacuri's application for voluntary departure, and this Court then granted his motion for a stay of removal

_____

[3] Because the BIA concluded Tacuri had not met his burden to demonstrate "exceptional and extremely unusual hardship," it did not examine whether Tacuri had met his burden of establishing he had good moral character.

pending our review of his case (legalese meaning Tacuri could remain in the United States until we decide his case). The time has come for us to do just that.

## Discussion

Tacuri argues that the BIA applied the wrong legal standard and ignored its own binding precedent when it overturned the IJ's grant of his application for cancellation of removal. The government counters that we lack the jurisdiction to review Tacuri's challenges to the BIA's decision.

We begin with a quick primer about the relief Tacuri requested. Cancellation of removal is one of the discretionary forms of relief available to the Attorney General for nonpermanent residents who have been deemed removable from the country when the applicants can establish the following four requirements: (1) they have been in the United States continuously for at least ten years; (2) they are a person of "good moral character"; (3) they have not been convicted of certain criminal offenses; and (4) -- the only part at issue here -- they can show that their removal would result in "exceptional and extremely unusual hardship" to a relative with permanent legal status in the United States. 8 U.S.C. § 1229b(b)(1); see also § 1229a(c)(4).

Before we get to the merits of this issue, however, we have a jurisdictional hurdle to clear. Typically, this Court lacks jurisdiction to review a BIA decision concerning this

discretionary remedy of cancellation of removal. 8 U.S.C. § 1252(a)(2)(B)(i); Alvarado v. Holder, 743 F.3d 271, 275 (1st Cir. 2014). We retain jurisdiction, however, over "constitutional claims or questions of law." 8 U.S.C. § 1252(a)(2)(D); Alvarado, 743 F.3d at 275. If Tacuri's arguments present constitutional or legal issues (and he argues they do), then we have jurisdiction and we review those claims de novo. See Alvarado v. Whitaker, 914 F.3d 8, 12 (1st Cir. 2019).

In his petition for review of the BIA's decision, Tacuri asserts the BIA both failed to identify and apply each of the factors identified in its governing precedent and expected him to meet a higher bar for the "exceptional and extremely unusual hardship" standard than that set forth in other cases. While the "choice and shape" of a legal standard is "quintessentially a question of law," Ayeni v. Holder, 617 F.3d 67, 71 (1st Cir. 2010), the presence of a constitutional or legal question is a "matter of substance, not a function of labeling," Alvarado, 743 F.3d at 275. To that end, styling a factual challenge as a constitutional or legal error -- as the government asserts Tacuri is doing here -- does not "transform an unreviewable issue of fact into a reviewable issue of law." Id.

As we have stated on more than one occasion, we usually decline to review a determination of whether an applicant for cancellation of removal has satisfied the hardship requirement

- 10 -

because this is typically a purely factual inquiry. Id. (citing Castro v. Holder, 727 F.3d 125, 128 (1st Cir. 2013)). Although applying the wrong legal standard is indeed a legal issue, the evidentiary weight involved in a hardship determination is not. Id. (collecting cases where we have not had jurisdiction to review challenges to alleged hardships to a petitioner's family). To be sure, the BIA does not commit an error of law "each and every time a piece of evidence is described with less than perfect accuracy." Ayeni, 617 F.3d at 72 (holding there was no jurisdiction to determine whether the BIA "neglected adequately to weigh the seriousness of [petitioner's] eldest child's asthma").

As we mentioned above, Tacuri attempts to clear this jurisdictional hurdle by presenting his claims as legal issues this Court has jurisdiction to review and decide. He identifies ways in which the BIA "cherry-pick[ed]" from the record to focus only on some facts while ignoring other facts, resulting (he says) in ultimately requiring him to show unconscionability to meet the hardship standard. He also asserts that even though the BIA cited three instrumental cases for the "exceptional and extremely unusual hardship" standard, it did not discuss these precedents nearly enough to justify reversing the IJ's decision.

The government responds that Tacuri merely disagrees with how the BIA weighed the facts in his case. Disagreement with how the BIA reached an unfavorable outcome, the government reasons,

is not a legal or constitutional issue that falls within our purview. And so the government urges us to dismiss Tacuri's petition for review for lack of jurisdiction.

It is not obvious to us whether Tacuri's arguments go only to his quibbling with the BIA's take on the facts of his case (as the government contends) or to his assertion that the BIA erred as a matter of law by applying a more demanding standard for Tacuri to meet than that identified in the caselaw. Fortunately, we need not decide because, as this Court has done before when statutory jurisdiction is ambiguous but the merits are straightforward, we bypass the jurisdictional issue and explain why the merits hold no water. See Alvarado, 743 F.3d at 276 (citing Royal Siam Corp. v. Chertoff, 484 F.3d 139, 144 (1st Cir. 2007)) (passing over a jurisdictional claim to explain why precedent "clearly dictates" the result on the merits). While federal courts typically cannot apply "hypothetical jurisdiction" in terms of Article III jurisdiction, we can sidestep statutory jurisdiction when, as here, it makes sense to do so because the resolution on the merits of the case is straightforward. Id. (collecting cases demonstrating this Court has taken this path in similar immigration cases). Without further ado, we therefore proceed to assess Tacuri's arguments on the merits.

To prove an "exceptional and extremely unusual hardship," an applicant must "establish that his qualifying

relatives would suffer hardship that is substantially different from, or beyond, that which would normally be expected from the deportation of an alien with close family members here." In re Monreal-Aguinaga, 23 I. & N. Dec. 56, 65 (BIA 2001) (en banc) (Matter of Monreal). An applicant need not show, however, that such hardship would be "unconscionable." Id. at 60-61. In Matter of Monreal, the BIA indicated immigration judges could work in the space in between "hardship that is substantially beyond that which would ordinarily be expected" and "unconscionability" by considering "the ages, health, and circumstances of qualifying lawful permanent resident and United States citizen relatives." Id. at 63. The BIA identified "strong" circumstances to include "an applicant who has elderly parents in this country who are solely dependent upon him for support . . . [or who has] a qualifying child with very serious health issues[] or compelling special needs in school." Id. In addition, the BIA stated:

> A lower standard of living or adverse country conditions in the country of return are factors to consider only insofar as they may affect a qualifying relative, but generally will be insufficient in themselves to support a finding of exceptional and extremely unusual hardship. As with extreme hardship, all hardship factors should be considered in the aggregate when assessing exceptional and extremely unusual hardship.

Id. at 63-64.[4]

---

[4] The BIA adopted these considerations from a more general hardship standard it applied before Congress changed the applicable standard from "extreme hardship" to "exceptional and

The "exceptional and extremely unusual hardship" standard "constitutes a high threshold that is in keeping with Congress' intent to substantially narrow the class of aliens who would qualify for relief." In re Gonzalez Recinas, 23 I. & N. Dec. 467, 470 (BIA 2002) (approving cancellation of removal for single mother of six children, four of whom are United States citizens, with no remaining close relatives in Mexico). While an applicant's child's poor health is a compelling factor, Matter of Monreal, 23 I. & N. Dec. at 63, the applicant must further establish that "the relative has a serious medical condition and, if he or she is accompanying the applicant to the country of removal, that adequate medical care for the claimed condition is not reasonably available in that country," Matter of J-J-G-, 27 I. & N. Dec. 808, 811 (BIA 2020) (holding that applicant's daughter's hypothyroidism may constitute a serious medical condition but does not constitute an "exceptional and extremely unusual hardship" because she could still receive medical care in Guatemala). Overall, the BIA couches its standard for "exceptional and extremely unusual hardship" in the qualifier that "reasonable people can agree that the meaning of these terms . . . are not terms of 'fixed and inflexible content or meaning.'" Matter of

extremely unusual hardship" in 1996. Alvarado, 743 F.3d at 276, 276 n.2 (citing Matter of Monreal, 23 I. & N. Dec. at 56 and Matter of Anderson, 16 I. & N. Dec. 596 (1978)).

- 14 -

Monreal, 23 I. & N. Dec. at 59 (citing Matter of Hwang, 10 I. & N. Dec. 448, 451 (BIA 1964)).

Now that we have identified the standard, we turn to Tacuri's specific arguments regarding his application and the way in which he claims the BIA erred in evaluating it. First, he argues that the BIA erred by ignoring its own precedent when it concluded he had not demonstrated an "exceptional and extremely unusual hardship" to his children if he is deported. Tacuri says the BIA's cursory citations to its own governing precedent for "exceptional and extremely unusual hardship" was not good enough because the BIA ignored the "particulars of the factors" these cases lay out. We disagree with Tacuri. Our caselaw indicates these citations are indeed good enough: For example, in Alvarado, the BIA didn't cite its most prominent hardship cases, and we still found no legal error because the BIA had applied the precepts from the cases. 743 F.3d at 276-77. Here, the BIA cited two governing cases, Matter of Monreal and In re Andazola-Rivas, 23 I. & N. Dec. 319, 323 (BIA 2002) (Matter of Andazola), acknowledging the precepts from these cases after it summarized the facts on the record about Tacuri's two children, including J.T.C.'s asthma and the family's economic circumstances.

On this same point, Tacuri argues that the governing caselaw "force[s the BIA] to address the complete record," which, according to Tacuri, the BIA did not do. For instance, Tacuri

points out how the BIA did not consider J.T.C.'s personal hygiene issues and only gave "selective" attention to J.T.C.'s asthma by mentioning it was "largely stable." Further, Tacuri asserts the decision failed to mention that J.T.C.'s $75 inhaler cost was the out-of-pocket cost after the insurance covered a portion and that J.T.C.'s asthma had gotten worse since his father's detainment. This argument falls flat, however, because he cites no caselaw to support the proposition that the BIA must specifically address every evidentiary submission within the record.

Tacuri also claims the BIA improperly "applied a higher standard than required" for determining "exceptional and extremely unusual hardship" by impermissibly (though not explicitly) requiring unconscionability. Remember, the BIA must "consider the ages, health, and circumstances of qualifying lawful permanent resident and United States relatives" but stops short of requiring unconscionability when it determines whether the applicant's removal would constitute "exceptional and extremely unusual hardship" to these family members. Matter of Monreal, 23 I. & N. Dec. at 63. Here, the BIA undoubtedly weighted some pieces of evidence differently than the IJ; otherwise it wouldn't have reached a different conclusion. But, in our view, the BIA did cite the appropriate standard and did not require the hardship to Tacuri's children to be unconscionable. In fact, the BIA decision does not mention the word "unconscionable" at all.

The "exceptional and extremely unusual hardship" standard is supposed to be hard to meet and is evaluated in comparison to the hardships typically felt by children whose parents are removed from the country -- this in itself sets a high bar. See Matter of Monreal, 23 I. & N. Dec. at 63; Matter of Gonzalez Recinas, 23 I. & N. Dec. at 470. While Tacuri justifiably believes the BIA's conclusion is unconscionable given the injurious impact his departure will have on his entire family, that does not translate to the BIA applying an unconscionability standard in its decision. Ultimately, Tacuri's claims boil down to his fundamental disagreement with how the BIA weighed and considered the facts in his case. The BIA adequately explained and supported its decision that Tacuri failed to meet the "exceptional and extremely unusual hardship" standard. Citing relevant precedent (as we addressed above), the BIA mentioned J.T.C. and K.T.C.'s ages, it explored the children's "alleged mental health issues," it addressed (however cursorily) J.T.C.'s asthma, and it considered the economic impact Tacuri's removal would have on his family.

All of this to say that, in our view, the BIA did not commit any legal errors when it concluded Tacuri had not met his burden to show his removal would result in "exceptional and extremely unusual hardship" to his family. To the extent Tacuri has challenged the BIA's decision as legally unsound, his claim

- 17 -

fails on the merits. And to the extent Tacuri has disputed the weight to which the BIA accorded some evidence over other evidence and some factors over other factors, we have no jurisdiction to consider these arguments.

### Conclusion

This case is yet another occasion when we "regret that we can do nothing more for petitioner[] and [his] children." Alvarado, 743 F.3d at 278. Tacuri's removal from this country will undoubtedly be devastating for his wife and children. The law, however, does not lean in Tacuri's favor, both in the daunting standard it sets and in the wide discretion it grants to the BIA to deny relief even when others would not do so. And so, for the foregoing reasons, the petition is **denied in part** and otherwise **dismissed** for lack of jurisdiction.