# United States Court of Appeals
## For the First Circuit

No. 24-1239

LEONARDO GONCALVES LEAO,

Petitioner,

v.

PAMELA J. BONDI, Attorney General,[*]

Respondent,

PETITION FOR REVIEW OF A DECISION OF
THE BOARD OF IMMIGRATION APPEALS

Before

Gelpí, Lipez, and Thompson,
Circuit Judges.

Annelise M. J. de Araujo, with whom Araujo & Fisher, LLC was on brief, for petitioner.

Spencer Shucard, with whom Brian Boynton, Principal Deputy Assistant Attorney General, Civil Division, and Keith I. McManus, Assistant Director, Office of Immigration Litigation, were on brief, for respondent.

July 14, 2025

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Pamela J. Bondi is automatically substituted for former Attorney General Merrick B. Garland as respondent.

**GELPÍ, Circuit Judge.** After being charged with violating immigration laws and conceding removability, Petitioner Leonardo Goncalves Leao ("Petitioner") sought cancellation of removal. He claimed that his removal would cause exceptional and extremely unusual hardship to his then-minor son, Gustavo -- a U.S. citizen. The immigration judge ("IJ") disagreed, holding that Petitioner failed to meet the high burden to establish such hardship. The Board of Immigration Appeals ("BIA") subsequently affirmed the IJ's judgment on two independent grounds: (1) it held that because Gustavo had turned 21 years old while the appeal was pending, Petitioner could no longer count him as a qualifying relative in his cancellation of removal petition; and (2) in the alternative, it agreed with the IJ's hardship determination. This petition for review followed. Because we discern no error in the hardship determination, we deny the petition for review and do not address the BIA's age-based rationale.

## I.

### A. Legal Background

A noncitizen found removable for violating immigration law may seek discretionary cancellation of removal under section 240A(b)(1) of the Immigration and Nationality Act (codified at 8 U.S.C. § 1229b(b)(1)). If an IJ grants the application, the noncitizen may remain in the country as a lawful permanent resident. Id.

In evaluating a noncitizen's application for cancellation of removal, known as a 42B application, the IJ "proceeds in two steps." Wilkinson v. Garland, 601 U.S. 209, 212 (2024). First, the IJ determines whether a noncitizen has established four statutory requirements: (1) the noncitizen "has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of [the] application"; (2) the noncitizen "has been a person of good moral character during such period"; (3) the noncitizen "has not been convicted of" certain criminal offenses; and (4) the noncitizen's "removal would result in exceptional and extremely unusual hardship to the [noncitizen's] spouse, parent, or child, who is a citizen of the United States or a[ noncitizen] lawfully admitted for permanent residence." 8 U.S.C. § 1229b(b)(1)(A)-(D). Then, at the second step, the "IJ decides whether to exercise his discretion favorably and grant the noncitizen relief in the particular case." Wilkinson, 601 U.S. at 212-13. The "noncitizen bears the burden of proving that he both 'satisfies the applicable eligibility requirements' and 'merits a favorable exercise of discretion.'" Id. at 213 (quoting 8 U.S.C. § 1229a(c)(4)(A)).

Following an unfavorable IJ decision, the noncitizen may appeal to the BIA. 8 C.F.R. § 1003.1(b)(3). The BIA, in turn, reviews de novo "the IJ's conclusions of law and discretionary

determinations," and examines for clear error the IJ's factual findings. Contreras v. Bondi, 134 F.4th 12, 15 (1st Cir. 2025).

## B. Factual and Procedural Background

In 2001, Petitioner, a native and citizen of Brazil, had a brief relationship with Aparecida dos Santos ("Ms. dos Santos"). Unbeknownst to Petitioner, Ms. dos Santos became pregnant and moved to the United States. There, she gave birth to their son Gustavo (a U.S. citizen) in February 2002. Motivated by a desire to be with his son, Petitioner entered the United States without inspection via the Mexican border on June 8, 2004. By the end of that day, Petitioner had arrived in Boston, Massachusetts, and met Gustavo for the first time. Since then, Gustavo has lived with Ms. dos Santos, but Petitioner has lived nearby, providing financial and emotional support.

On October 9, 2014, the U.S. Department of Homeland Security issued and served Petitioner with a Notice to Appear, charging him with impermissibly entering the United States. As a result, Petitioner was detained until November 5, 2014, when an IJ released him on bond. In April 2015, Petitioner admitted the allegations and conceded removability, but he expressed an intent to seek cancellation of removal. So he filed a 42B Application in

- 4 -

May 2016.  Citing his heavy caseload, the IJ set the hearing date on Petitioner's 42B application for April 25, 2019.[1]

The hearing occurred as originally scheduled.  The presiding IJ accepted Petitioner's five documentary exhibits.  We summarize the relevant evidence, starting with Petitioner's testimony.

Petitioner stated his age (42 years at the time) and recounted his journey from Brazil to the United States.  He described his relationship with Gustavo, explaining how he consistently saw him three times per week.  Petitioner said that Gustavo grew up a happy, calm kid.  But Petitioner noticed that Gustavo began to change in 2014 -- around the time of Petitioner's detention.  Petitioner testified that, as of the date of the hearing, Gustavo "[wa]s out of school" and "refusing to go back to his studies."

Petitioner's testimony, along with the other evidence, paints a bleak picture.  As Petitioner's brief puts it, Gustavo was "a teenager out of control and spiraling downwards."  On one occasion, Gustavo broke a classmate's cell phone.  And, on another, he brought a box cutter to school.  His troubles extended beyond

---

[1] In setting the hearing date, the IJ flagged to Petitioner's counsel that "if [she] ha[d] everything ready to go and all supporting documents say in a couple of months, [he] would consider a motion to move [the hearing] up if [he] had a cancellation." Petitioner nowhere suggests that he filed any such motion.

the classroom: at one point, police detained him for stealing a cell phone at the YMCA. Following the alleged theft, police told Petitioner that Gustavo was hanging out with troublesome peers, including someone accused of a local shooting.

With Petitioner's blessing, Ms. dos Santos moved Gustavo to the Town of Walpole. Despite the distance from negative peer influences, Gustavo's problems persisted. He refused to go to school, lost multiple jobs, and used marijuana. Petitioner admitted that he tried talking to Gustavo and that Gustavo had refused help, even with resources available to him.

Petitioner stated that he wished to stay in the country so that he could continue supporting Gustavo in this pivotal time. And he expressed concern that his removal would cause Gustavo to lose his emotional support system. He likewise feared that, if he were removed to Brazil, he would be making much less money ($160 per week there versus $850 per week in the United States) and thus would be less able to financially support Gustavo.

On cross-examination, the government extracted concessions from Petitioner. For instance, Petitioner acknowledged that Gustavo was healthy and that it was ultimately Gustavo's choice whether to follow advice or not. Petitioner also noted that Gustavo had never lived with him. Petitioner admitted, too, that Gustavo had refused the opportunity to provide live testimony or an affidavit to support Petitioner at the hearing.

And Petitioner conceded that Gustavo had visited Brazil before. He explained, however, that neither he nor Ms. dos Santos would be able to afford Gustavo's flight to Brazil if Petitioner was removed.

Turning to the documentary evidence, Petitioner's declaration tracked much of his testimony, with a few additional details. In particular, he added that the catalyst for Gustavo's spiral was not only Petitioner's detention, but also the deaths of two family members. Petitioner also noted that Gustavo spent much of his time locked in his bedroom, sometimes smoking marijuana.

Ms. dos Santos's declaration similarly corroborated Petitioner's testimony. She explained the extent of Petitioner's support for her and Gustavo, and how she would be unable to support Gustavo alone. She described how she saw Gustavo beginning to change during Petitioner's detention and experiencing anxiety about losing his father. She also confirmed that Gustavo had routinely refused offers to help, including from his parents and the local government. She, too, shared that Gustavo had developed a marijuana smoking habit. And she expressed her worry about what would happen following Petitioner's removal: Gustavo would "find[] bad examples to follow in the vacuum that would be left by [Petitioner's] absence," and his "chances of turning his life around would be gone."

After the IJ heard the testimony and reviewed the documentary evidence, the parties had an opportunity to present closing arguments. Petitioner argued that this was no ordinary case, in part, because Gustavo did not have "a physical health issue" nor was he "receiving special attention at school[,] such as an individualized educational plan." Instead, Petitioner contended that the case was about a rebellious teenager spiraling out of control and in need of his father. That downward trend, Petitioner pressed, would exacerbate after Petitioner's removal, such that Gustavo would not "become[] a good adult and turn[] his life around." "[T]aking away that chance from [Gustavo]," Petitioner stressed, would be "exceptional."

The government then had its opportunity to close. It began by conceding the importance of a present parent in an adolescent's life. Still, it insisted that Petitioner had failed to prove that his removal would cause Gustavo exceptional and extremely unusual hardship. The government cited Gustavo's age at the time of the hearing (17 years old), his responsibility for poor decision-making, and the presence of his mother, who would remain his primary caretaker after Petitioner's removal and thus blunt the severity of any hardship.

After closing arguments, the IJ issued an oral ruling. He remarked that, although the case was "very close" and the facts were "very sympathetic," Petitioner failed to prove that his

removal would cause Gustavo exceptional and extremely unusual hardship. The IJ made the following factual findings to support that conclusion: (1) Petitioner was a credible witness; (2) Gustavo was 17 years old and had various troublesome incidents, including bringing a boxcutter to school, breaking a classmate's phone, and stealing a cell phone at the YMCA; (3) Gustavo had dropped out of school and refused to hold a job; (4) the record did not reflect that Gustavo suffered from any medical issues; (5) Gustavo lived with his mother, who worked full-time and earned roughly $32,000 per year; (6) Petitioner provided financial and emotional support to Gustavo; (7) Petitioner talked to Gustavo regularly; and (8) Petitioner never lived with Gustavo.

In his legal analysis, the IJ addressed the four statutory factors noted above, finding that Petitioner had met the first three -- physical presence in the United States for at least ten years, good moral character, and no convictions for the specified offenses. The government does not contest those findings, and we therefore focus only on the IJ's analysis of the fourth factor: whether Petitioner had proven that his removal would result in exceptional and extremely unusual hardship.

The IJ began by acknowledging that Gustavo would experience hardship if Petitioner were removed. But he decided that the hardship "would not be substantially beyond that which would ordinarily be expected." The IJ bolstered his conclusion by

pointing to Ms. dos Santos, who was Gustavo's primary caretaker and had a steady income. The IJ then took notice of the lack of evidence showing Gustavo had a medical diagnosis. "[I]ndeed," he observed, Petitioner's counsel "argue[d] this [wa]s not a case in which [Gustavo] ha[d] any medical issues, but rather the separation and [Gustavo's] life would essentially go in a bad direction . . . if [Petitioner] was deported."

The IJ next considered whether Gustavo had academic or learning disabilities. And he found that none were apparent from the record. Although the IJ noted Gustavo's brief stint in substance abuse therapy in 2018, he found that such therapy would remain available in Petitioner's absence. The IJ also mentioned the lack of record evidence suggesting that Petitioner "provide[d] healthcare services or health insurance to [Gustavo]." Likewise, he stated that Petitioner had proffered no expert or medical reports "to provide an opinion that would be helpful to [the IJ] on the issue of what effect [Petitioner's] removal would have on . . . Gustavo."

As for Petitioner's relationship with Gustavo, the IJ found that Petitioner "d[id] help [Gustavo] financially and emotionally in both support and in an attempt to get his life back on track." And from Brazil, the IJ said, Petitioner could earn a living and continue to "provide that guidance and advice [to Gustavo] either telephonically or messaging." At bottom, despite

Gustavo's troubles and Petitioner's role in Gustavo's life, the IJ held that Petitioner had failed to carry his burden of showing that Gustavo would experience exceptional and extremely unusual hardship if Petitioner were removed from the country.

Petitioner filed a notice of appeal on May 22, 2019. Because of the BIA's alleged delay in issuing transcripts, Petitioner claims he could not submit his appellate brief to the BIA until September 2021.

The BIA ruled on the appeal in February 2024. The analysis underlying the decision spans two paragraphs and resolves the appeal on two alternative grounds. First, the BIA held that, because Gustavo had reached 21 years old while the appeal was pending, he no longer qualified as a "child" for purposes of an application for cancellation of removal. And second, the BIA ruled in the alternative that it "agree[d] with the [IJ's] reasoning that respondent did not establish [Gustavo]'s hardship would rise to the level of exceptional or extremely unusual hardship." The BIA acknowledged Petitioner's contention that Gustavo's problems arose after the ICE detention in 2014, but it said that "the [IJ] assessed [Gustavo's] circumstances, including that his biological mother is his primary caretaker, and that he can receive therapy even if [Petitioner] is removed." The BIA noted, too, that the IJ found that "the record lacked any expert or medical reports which indicate what the effect of the [Petitioner's] removal will be on

- 11 -

[Gustavo]."  In sum, the BIA determined that, despite the "sympathetic circumstances presented, [it] agree[d] with the [IJ] that" Petitioner had not "shown that [Gustavo's hardship would] rise[] to the requisite level for cancellation of removal."

Petitioner timely sought our review.

## II.

Before we address the merits, we must first draw the boundaries of our review.  That is, we must decide whether to fix our scope on solely the BIA's decision, or to look also to the IJ's decision.  We likewise must delineate the limitations on our jurisdiction to review a denial of an application for cancellation of removal.

## A.

We begin with the scope.  We have said that "[w]hen the BIA 'adopts and affirms' an IJ's conclusion," Varela-Chavarria v. Garland, 86 F.4th 443, 449 (1st Cir. 2023) (quoting Barnica-Lopez v. Garland, 59 F.4th 520, 527 (1st Cir. 2023)), or "embraces the [IJ's] decision" but adds its own "'gloss to the IJ's findings and conclusions, we treat the two decisions as one,'" Loja-Tene v. Barr, 975 F.3d 58, 60 (1st Cir. 2020) (quoting Murillo-Robles v. Lynch, 839 F.3d 88, 91 (1st Cir. 2016)).  Similarly, when "the BIA has deferred to or adopted the IJ's reasoning, we review both the BIA's decision and relevant parts of the IJ's decision." Conde Cuatzo v. Lynch, 796 F.3d 153, 156 (1st Cir. 2015).  If, however,

"the BIA does not adopt the IJ's findings, we review the BIA's decision rather than the IJ's." Odei v. Garland, 71 F.4th 75, 77 (1st Cir. 2023) (quoting Aguilar-Escoto v. Garland, 59 F.4th 510, 515 (1st Cir. 2023)).

Here, the BIA stated that it "agree[d] with the [IJ's] reasoning that [Petitioner] did not establish his son's hardship would rise to the level of exceptional or extremely unusual hardship." It added a bit of gloss and then, again, pronounced its agreement with the IJ's decision "that although [Gustavo] will face hardship upon [Petitioner's] removal," Petitioner had not "shown that [the hardship] r[ose] to the requisite level for cancellation of removal."

In other words, the BIA expressly adopted the IJ's reasoning and embraced his factual findings. So we view the two decisions as one.[2] And, in doing so, "we refer to the IJ and BIA collectively as 'the agency.'" Martinez v. Bondi, 132 F.4th 74,

---

[2] Petitioner does not meaningfully contend with our precedent in his opening brief, ostensibly assuming that our review centers only on the BIA's decision. His reply brief, too, devotes little time to this cause. So he waived any argument challenging the scope of our review. See Odei, 71 F.4th at 79 ("It is firmly settled in our jurisprudence that 'arguments advanced in a perfunctory manner, unaccompanied by citations to relevant authority, are deemed waived.'" (quoting Ahmed v. Holder, 611 F.3d 90, 98 (1st Cir. 2010))); see also id. at 80 (holding the same for arguments first raised in a reply brief). And even if we set aside our well-settled waiver rules, we disagree with Petitioner's reading of the BIA's decision.

- 13 -

78 (1st Cir. 2025) (quoting <u>Khalil</u> v. <u>Garland</u>, 97 F.4th 54, 61 (1st Cir. 2024)).

**B.**

We turn next to the limitations on our review. "Congress has sharply circumscribed judicial review of the discretionary-relief process." <u>Patel</u> v. <u>Garland</u>, 596 U.S. 328, 332 (2022). It "has stripped courts of 'jurisdiction to review . . . any judgment regarding the granting of' discretionary relief, which includes the denial of an application for cancellation of removal under § 1229b." <u>Contreras</u>, 134 F.4th at 19 (quoting 8 U.S.C. § 1252(a)(2)(B)(i)). Yet "[t]his bar has an important qualification." <u>Id.</u> (alteration in original) (quoting <u>Patel</u>, 596 U.S. at 333). "Courts retain jurisdiction to 'review . . . constitutional claims or questions of law.'" <u>Id.</u> (omission in original) (quoting 8 U.S.C. § 1252(a)(2)(D)).

Recent developments in our precedent and that of the Supreme Court have clarified the questions subject to our review in this context. Most relevant here, a petitioner's challenge to "'the application of the exceptional and extremely unusual hardship standard to a given set of facts'" -- "a mixed question of law and fact" -- constitutes a "'reviewable question of law.'" <u>Id.</u> (quoting <u>Wilkinson</u>, 601 U.S. at 217). So too does a petitioner's claim that the agency disregarded its settled course

- 14 -

of adjudication.  See Adeyanju v. Garland, 27 F.4th 25, 37 (1st Cir. 2022).

But the Supreme Court has reiterated that we lack jurisdiction to review factual questions.  Wilkinson, 601 U.S. at 222 ("[A] court is still without jurisdiction to review a factual question raised in an application for discretionary relief." (citing Patel, 596 U.S. at 347)).  That means we cannot disturb the agency's factual findings, such as "an IJ's determination that a witness was credible or that a child 'had a serious medical condition.'"  Contreras, 134 F.4th at 19 (quoting Wilkinson, 601 U.S. at 222).

**III.**

Assured of the scope of our review and our jurisdiction, we move to the merits.  Petitioner raises a slew of challenges to the agency's hardship determination.  Most of his claims relate to the agency's failure to follow its settled course of adjudication -- legal questions subject to our de novo review. See id. at 20 ("[W]e review preserved claims of legal error (that is, claims that turn on pure questions of law) de novo." (alteration in original) (quoting United States v. Padilla-Galarza, 990 F.3d 60, 73 (1st Cir. 2021))).  And his final complaint is that the agency erred in its ultimate hardship determination.  As the Supreme Court has instructed, our review of that determination -- a "primarily factual" "mixed

- 15 -

question" -- "is deferential."  Wilkinson, 601 U.S. at 225; see also Figueroa v. Garland, 119 F.4th 160, 166 & n.7 (1st Cir. 2024).

## A.

We begin with the legal questions.  Petitioner claims that the agency ran afoul of its settled course of adjudication in five ways: (1) the BIA did not explicitly state a standard of review; (2) the BIA applied the incorrect standards of review; (3) the agency sidestepped some of the Monreal factors in making its determination; (4) the agency cherry-picked evidence; and (5) the agency impermissibly demanded expert or medical reports to prove hardship.  We take these arguments in turn and find none to be persuasive.

### 1. Failed to State the Standard

First, Petitioner contends that the BIA erred by neglecting to expressly invoke a standard of review.  Not so.

Petitioner rests his argument on Hernandez v. Garland, where the Second Circuit stated that "the BIA must not only state the correct standard, but apply it."  66 F.4th 94, 102 (2d Cir. 2023).  Working from that statement, Petitioner seems to suggest that the BIA has a duty to expressly spell out the standard of review in each of its decisions.

No matter the effect of the Second Circuit's ruling, it does not control here.  Indeed, we have flatly rejected such a "standard-of-review-based challenge" where the BIA's opinion

- 16 -

"found the IJ's holding to be 'correct[]' and cited legal authority for its conclusion." See Samayoa Cabrera v. Barr, 939 F.3d 379, 383 (1st Cir. 2019). And to the extent that Petitioner invites us to revisit that precedent, we decline to do so because he has not developed sufficient argumentation. See Odei, 71 F.4th at 79.

## 2. Applied the Wrong Standard

Second, building off the mistaken premise that the BIA needed to explicitly invoke the standard of review, Petitioner asserts that the BIA then applied the wrong one. We disagree.

The BIA reviews an IJ's factual findings for clear error and the IJ's ultimate hardship determination de novo. See Barros v. Garland, 31 F.4th 51, 57 (1st Cir. 2022). "For our part, we review de novo the question of whether the BIA applied the correct standard of review." Khalil, 97 F.4th at 67.

As we just explained, the BIA need not recite the familiar incantations "clear error" or "de novo" in reaching its decision. See Samayoa Cabrera, 939 F.3d at 383. That is so because we attach a "presumption of regularity . . . to the BIA's official acts." Id. (quoting Enwonwu v. Gonzáles, 232 F. App'x 11, 15 (1st Cir. 2007) (per curiam)). And we spot legal error only where the petitioner shows some evidence or indication that the BIA employed the wrong standard. See id. ("[W]hile it is true that the BIA's opinion does not explicitly spell out the standard of review it applied on this point, we see no evidence that it

- 17 -

reviewed the IJ's conclusion for clear error . . . ."); see also Nolasco v. Bondi, 134 F.4th 677, 686 (1st Cir. 2025) ("[T]here is no indication that an incorrect standard was applied here.").

There is no such indication here. Start with the allegedly suspect factual findings. Petitioner insists that the BIA must have applied the wrong standard of review because it did not disturb the IJ's baseless conclusions. He offers as an example the IJ's finding about Petitioner's ability to provide adequate guidance to Gustavo from Brazil. Had the BIA conducted the requisite clear-error review, Petitioner attests, it would have found to be unsupported the IJ's conclusion that Petitioner "can provide that guidance and advice either telephonically or messaging from Brazil."

Petitioner is wrong. To continue Petitioner's example, the IJ's factual finding about Petitioner's ability to provide guidance from Brazil was a "predictive finding[] of what may or may not occur in the future" -- a factual finding subject to the BIA's clear-error review. Samayoa Cabrera, 939 F.3d at 382 (quoting Matter of Z-Z-O-, 26 I. & N. Dec. 586, 590 (BIA 2015)). And as we've already mentioned, the rest of Petitioner's challenges to the IJ's factual findings were subject to the same clear-error review by the BIA. See Barros, 31 F.4th at 57. That standard is a tough one to meet and requires deference unless -- "after whole-record review -- [the BIA] ha[s] 'a strong, unyielding

belief' that the [IJ] stumbled." Adeyanju, 27 F.4th at 33 (second alteration in original) (quoting United States v. Rivera-Carrasquillo, 933 F.3d 33, 42 (1st Cir. 2019)).

Given the BIA's decision, we cannot say that it applied the wrong standard to the IJ's factual findings. After acknowledging the difficult situation Petitioner's removal has put Gustavo in, the BIA stated "[h]owever, the [IJ] assessed the son's circumstances," and proceeded to list important factual findings. This process of first addressing Petitioner's argument before deferring to the findings of the IJ is consistent with clear-error review. So we see no evidence that the BIA reviewed the IJ's findings for anything besides clear error and reject Petitioner's argument. See Samayoa Cabrera, 939 F.3d at 383.

Nor has Petitioner convinced us that the BIA skirted its obligation to review de novo the IJ's hardship determination. The sum total of Petitioner's argument on this score is that the BIA's one-paragraph exposition reflects "a highly deferential (non-de novo) review to the entire hardship decision," or worse yet, "a thoughtless summary of [the BIA's] favorite parts [of] the IJ's decision." That lone sentence, however, does not provide an indication that the BIA applied the wrong standard of review. To the contrary, the BIA stated, "we agree with the [IJ's] reasoning that [Petitioner] did not establish his son's hardship," and cited its guiding precedent on this legal issue, Matter of Monreal. To

agree with "suggests not deference to, but rather alignment with" the IJ's assessment. DeCarvalho v. Garland, 18 F.4th 66, 74 (1st Cir. 2021). Alongside the supportive citation, see Khalil, 97 F.4th at 68, we find no indication that the BIA failed to review the IJ's hardship determination de novo.

For these reasons, we reject Petitioner's arguments that the BIA reviewed his appeal under an incorrect standard of review.

### 3. Ignored Monreal Factors

Third, Petitioner claims that the agency disregarded its settled course of adjudication when it did not consider all the Monreal factors. We are unpersuaded.

Both parties agree that the BIA's decision in Matter of Monreal-Aguinaga, 23 I. & N. Dec. 56 (BIA 2001), is the starting point for determining what constitutes exceptional and extremely unusual hardship standard. There, the BIA explained that the relevant factors to consider include (1) the age of the qualifying family member, (2) "family ties in the United States and abroad," (3) "length of residence in this country," (4) "the health of the [petitioner] and qualifying family members," (5) "the political and economic conditions in the country of return," (6) "the possibility of other means of adjusting status," (7) "the [petitioner's] involvement and position in his or her community here," and (8) the petitioner's "immigration history." Id. at 63. The agency considers these facts "in the aggregate" and makes

hardship determinations on a case-by-case basis.  Nolasco, 134 F.4th at 683 (quoting Matter of Monreal, 23 I. & N. Dec. at 64).

Viewing the BIA's holding (in which it expressly cited Monreal) together with the IJ's decision, we see no reason to believe that the agency ignored the Monreal factors relevant to the hardship determination in this case.  To be sure, the agency's decision did not invoke each Monreal factor.  But Monreal itself uses permissive language when discussing the factors -- that is, it says that the eight factors "are all proper factors to be considered."  Matter of Monreal, 23 I. & N. at 63.  And Petitioner cites no authority suggesting that Monreal obligates the agency to consider every factor in every case.  What is more, Petitioner "ha[s] not explained how consideration of [his desired factors] would bolster [his] hardship claim."  Nolasco, 134 F.4th at 685.  So "we cannot conclude it was legal error for the agency not to explicitly address" those desired factors.  Id.

### 4. Failed to Consider All Evidence

Fourth, Petitioner contends that the BIA cherry-picked certain record evidence while ignoring other evidence that would have changed the outcome.  That argument resembles the petitioner's contention in Tacuri-Tacuri v. Garland: "that the governing caselaw 'force[s the BIA] to address the complete record.'"  998 F.3d 466, 473 (1st Cir. 2021), abrogation on other grounds recognized by Figueroa, 119 F.4th at 165 (1st Cir. 2024)

- 21 -

(alteration in original). But here, as there, the "argument falls flat" because Petitioner "cites no caselaw to support the proposition that the BIA must specifically address every evidentiary submission within the record." Id. And, to the extent Petitioner argues that the agency overlooked critical evidence, that claim would fail, too, because he has not pointed to any such evidence, nor has he proffered how consideration of such evidence would bolster his claim. See Nolasco, 134 F.4th at 685.

### 5. Required Medical or Expert Report

Fifth, Petitioner argues that the agency defied its own precedent by requiring him to provide expert or medical reports to establish Gustavo's hardship. We see nothing in the record to support such an assertion. Indeed, the BIA has acknowledged that a testifying applicant generally "will lack the firsthand knowledge and medical expertise needed to provide persuasive and sufficiently specific testimony regarding the seriousness of a qualifying relative's medical condition . . . to meet [his] burden" of proof on that issue. Matter of J-J-G, 27 I. & N. Dec. 808, 811-12 (BIA 2020). In other words, if the record lacks expert confirmation of a claimed medical condition, the petitioner may have more difficulty proving the severity of the relative's medical issues. The IJ's conclusion here that Petitioner's evidence fell short is fully consistent with the BIA's observation and a far cry from imposing a categorical requirement for expert or medical

reports. And, to the extent Petitioner is seeking to dispute the IJ's factual determination on Gustavo's medical condition, we lack jurisdiction to second-guess that evidentiary finding. See Contreras, 134 F.4th at 20 ("[A]part from any associated legal errors, we may not consider . . . petitioner['s] assertion that the IJ erred in determining that [the qualifying relative] 'does not suffer from any serious medical conditions.'" (quoting Wilkinson, 601 U.S. at 225)).

**B.**

With the purely legal questions addressed and the factual findings set, we turn to Petitioner's final claim. It "boil[s] down to his fundamental disagreement with how the [agency] weighed and considered the facts in his case." Tacuri-Tacuri, 998 F.3d at 474. Yet, as we explain, the agency "adequately explained and supported its decision that [Petitioner] failed to meet the 'exceptional and extremely unusual hardship' standard." Id.

To constitute "exceptional and extremely unusual, the hardship to a noncitizen's relatives must be substantially beyond the ordinary hardship that would be expected when a close family member leaves this country." Nolasco, 134 F.4th at 682 (citation modified). This "standard is supposed to be hard to meet and is evaluated in comparison to the hardships typically felt by children whose parents are removed from the country -- this in itself sets a high bar." Tacuri-Tacuri, 998 F.3d at 474. Although that

standard does not mandate the hardship be "unconscionable," the circumstances must be "truly exceptional." Matter of Monreal, 23 I. & N. Dec. at 60-61, 62. And our review of the agency's determination "is deferential."[3] Figueroa, 119 F.4th at 166.

Given that high burden and our deferential standard of review, we cannot hold that the agency erred in reaching its hardship determination. Recall the agency's decision. It evaluated the relevant facts and held that Petitioner did not meet the high burden of showing exceptional and extremely unusual hardship. It acknowledged Petitioner's relationship with Gustavo,

_____

[3] In one sentence in his opening brief, Petitioner urges "this Court [to] review the [agency's] hardship determination de novo." But the argument suffers from multiple levels of waiver. First, such a bare statement, unaccompanied by developed argumentation, "is plainly insufficient as an argument." Martinez-Burgos v. Guayama Corp., 656 F.3d 7, 10 (1st Cir. 2011). And although Petitioner spends a little more time on this proposition in his reply brief, we do not consider it. See id. ("Arguments raised for the first time in a reply brief are waived." (quoting United States v. Vanvliet, 542 F.3d 259, 265 n.3 (1st Cir. 2008))).

Second, even if we set aside that threshold defect, the argument as presented in his reply brief likewise falls short for lack of development. We elaborate briefly. At its core, Petitioner's position in reply is that the Supreme Court's statement in Wilkinson -- that the "review is deferential" -- is dictum. Petitioner, however, makes no effort to wrestle with our precedent, which binds us and dictates that our review of these questions is deferential. See Contreras, 134 F.4th at 19 & n.7 (explaining that "[o]ur review of the BIA's determination 'is deferential'"). So that argument, too, is waived. See Figueroa, 119 F.4th at 166. We accordingly proceed as we did in Figueroa: viewing the BIA's hardship determination through a deferential lens, without deciding the amount of deference we afford to such determinations. See id. at 166 n.7.

- 24 -

including his role financially and emotionally supporting Gustavo. And, in light of Gustavo's troubles in school, the community, and at home, the agency did find that Gustavo would experience hardship after Petitioner's removal. But, given other evidence in the record, the agency found that the hardship would not be substantially beyond that which is normally expected when a close family member leaves this country. It held as much because Gustavo would still have his mother -- who is his primary caretaker and has a stable income. The agency likewise rested its conclusion on the fact that Gustavo would continue to have access to therapy and other health services. And it considered, too, that Petitioner failed to prove that Gustavo needed him for either healthcare services or health insurance.

Petitioner says that the agency's conclusion was "unjustifiable." In his words, "[t]he question presented was whether a 17-year-old drug addict who had dropped out of high school would suffer 'substantially beyond the ordinary hardship that would be expected when a close family member leaves the country.'" And, he continues, "nothing in the record . . . indicate[s] that Gustavo, who had been refusing treatment, would somehow overcome this position in light of losing his father's presence."

We do not doubt the hardship that Gustavo has faced, let alone what he will face following his father's removal. At the

same time, the question before us is whether Petitioner carried his burden of showing that Petitioner's removal would cause Gustavo to experience exceptional and extremely unusual hardship. The corollary requirement is that the petitioner must prove some nexus between his remaining in the country and the qualifying relative's hardship. Relevant here, Petitioner had to demonstrate that his presence in the country was reasonably necessary to prevent, or at least manage, the resulting hardship.

The agency found that Petitioner failed to make that showing. We agree. Remember, Petitioner admitted that Gustavo did not heed parental guidance and refused to accept available treatment -- despite Petitioner's proximity to, and regular contact with, Gustavo. And, aside from Petitioner's conjecture, there was no evidence to show that Gustavo's poor decisions would subside if the agency granted Petitioner's application for cancellation of removal. True, Petitioner claims that Gustavo's behaviors were symptomatic of psychological difficulties for which he might need treatment or parental guidance and assistance. But the agency supportably found that Petitioner did not prove that Gustavo suffered from psychological difficulties so severe that the loss of Petitioner's presence and in-person guidance would result in exceptional and extremely unusual hardship. Cf. Pandit v. Lynch, 824 F.3d 1, 4 (1st Cir. 2016).

In sum, although we sympathize with Petitioner, we cannot conclude that the agency got it wrong on this record.

**IV.**

For all these reasons, we **deny** the petition for review.